and if you want to do rebuttal, please try to save a little bit of time. I shall endeavor, Judge Wolter, to save possibly two minutes' time. Hopefully, in the course of the flow of the argument, I will be able to do that. I'm starting my watch now. I see my time is already running, so I will begin. Again, may it please the Court, counsel. This case presents the Court with a series of errors on the part of the trial court and raises questions concerning the admission of evidence in several different areas. One of those areas being the area of eyewitness identification evidence, evidence concerning the utilization of a photo spread, evidence concerning the use of an identification procedure that we have challenged as being constitutionally confirmed. It also involves the presentation of evidence by an officer of the Court, a probation officer, probation officer Glover, who was allowed to testify by the Court under somewhat rigid constraints on the foundation or background of that witness in terms of his status as a probation officer. But in the course of not only allowing that testimony to proceed, which we contend was error, an additional error was created when that probation officer varied from testimony he had previously given, testimony that had been, if you will, approved by the district court to change his testimony and to, in fact, create what I contend was a Sixth Amendment confrontation error. What links these claims of error, including that pertaining to the admission of the rebuttal evidence, I suggest is a violation of the Sixth Amendment right to trial by a jury where the jury, not the prosecutor, not the judge, not a probation officer, not an FBI agent in the course of conducting a photo spread examination, the jury decides the facts based upon reliable evidence. I'd like to first turn... I'll just get some background things straightened out. On the eyewitness ID, or the interaction of the eyewitness ID and the photo array, Ms. Green testified, there were two trials, is that right? That is correct. And at the second trial, Ms. Green testified on an in-court identification. Ms. Green made a single statement concerning the in-court identification of the defendant. Okay. Was the photo array evidence, I mean, the fact that she had identified this person from the photo array and the fact that Mr. Zimmerman, who did not testify at the second trial, had identified him from the photo array, was that separately introduced as part of the government's case? That was separately introduced as part of the government's case, and Mr. Zimmerman did testify at the second trial. Oh, he did. Yes, he did. But he did not testify as an eyewitness in terms of giving an in-court identification. His sole purpose was to allow for the introduction of his identification with respect to the eyewitness identification. So are there two different... What I'm trying to clarify is this. Are there two different standards that operate with regard to the introduction of the photo array ID itself and the introduction of in-court identification as to whether it was tainted by the earlier photo array? Is there a different standard and a different amount of room for the jury, depending which one you were talking about? This wasn't clear to me in the briefing, but it was clear to me from other cases. It is not clear. And I would indicate, or at least I would respond to your Honor's query with the response that there has been no distinction, but there certainly ought to be. Because without a distinction in terms of assessing, first of all, the constitutionality of the photo spread identification process, we have what happened in this case where basically we have three identifications that are admitted during the course of the second trial. An in-court identification by the teller, Green, and two out-of-court identifications by witnesses Zimmerman and Green based on the photo spread. And if the photo spread is, as I suggest it is, constitutionally informational because of its suggestiveness, and if the procedure that was utilized by FBI agent Whipple to develop those photo spread identifications is constitutionally unacceptable, then we have the odd situation here where the majority of the evidence, the majority of the identification evidence submitted to the trial jury in the second case, in the second trial, as this Court notes, was in fact tainted evidence. Why don't you get into the meat, at least from my perspective, the meat of your argument as to why you think the initial photo spread ID was unduly suggested. The meat of the argument requires an understanding with respect to the nature of human cognition and the reporting of memory in the course of an eyewitness identification procedure. And let me just say, Madsen v. Brathwaite, which is the only case, basically the last case where we have an articulated standard by the Supreme Court, it is now some 25 years old. It relied in part on factors concerning reliability developed in the Biggers case, which is now I think 27 years old or thereabouts. That case did connect two fundamental factors that I think are important. Fairness and reliability. And there's nothing in the law, nothing in Madsen v. Brathwaite, that says we are trapped in the epistemology of the 1970s, and which I would suggest was actually an epistemology that goes back to the 17th and 18th century, and that we cannot take advantage and look to developing scientific analysis with respect to eyewitness identification. Now, why I say that at the preamble is the following. With respect to memory, science teaches us, and Dr. Riesberg testified about this in the Illuminate Motion proceeding, that when a witness is asked to articulate a description, that verbal memory then becomes controlling concerning what later takes place when the witness is asked to perform an identification. I think Dr. Riesberg's point was that it is easier for the witness to recall the verbal formulation that the witness gives in response to a request for a description than it is to recall the human face. So in the process of seeking to obtain from a witness an identification, basically the theory is that if you present the witness with a selection, a photo script that in fact mirrors in the selection process with respect to not only the suspect photo, but as well the foiled photos, and again, the standard here has been established by the government itself in the 1999 study, which is referred to in the accounts opening brief, what they call a six-pack, a selection process that's a fair selection process with six opportunities to select. If each of those photographs in the photo spread mirrors the articulated description, then it is the theory that what will happen with respect to a witness looking at the photo spread is that they will make a selection process based on the ultimate gestalt underlying their verbal description, things that they weren't able to articulate but which they can, in fact, make a selection process. So all this testimony was before the court? All this testimony was before the court. And the fact finder has to look at it and make a decision. Do we have to accept the theories that were established in our appellate review? Is it we overrule the district judge's determination based upon your perception of what the expert testified to? I would be happy to proceed with a fair reading as to what the expert testified to. And this is a question of fair reading. I sat and heard experts as a trial judge, and some I thought it just didn't make sense to me, and others did. I mean, somebody has to make that determination. It sounds like to me that you're asking us to accept the expert, when I think that's the role of the trial judge to make that initial cut. It is the role of the trial judge to make that initial cut. But in my opinion, the trial judge in this case didn't understand the expert testimony. And, in fact, the court did not. And where do you find that in the record, that he did not understand? Has he made a statement, I do not understand? No, the judge did not make that statement, and it was Judge Brown. And I find that in the record, with respect to her exclusion of the third photograph in the photographic array. Again, just to go back to Judge Gould's question concerning the photo spread. We have a photo spread. We have clearly, with respect to the witnesses who were asked to give articulated descriptions, descriptions that refer to an individual with long, black, wavy hair. If you look at the photo spread, and I think it's Excerpt of Record 52, a booking photo of Mr. Becks appears in position number five. In position number one was an individual with a beard. Nobody mentioned a beard in terms of the articulated descriptions. In position number four and number six were individuals with short hair. Again, based on the science that was before the court, none of those individuals are going to be selected because they do not conform to the verbal memory of the witnesses that was developed at the time of the description. Judge Brown referred to photograph number three. Now, Agent Whipple himself admitted that, with respect to photograph number three, this again is page 51. This is the government's exhibit. With respect to photograph number three in the photo spread, Judge Brown stated that, well, she didn't think that necessarily that photograph was excluded because, and here's what she said, she said, quote, it looks like his hair is wet, end of quotation. In other words, she introduced a new descriptor into the photo spread analysis. Can I ask a question? Did Dr. Riesberg testify before the jury? Yes, she did. So why, and I think this has something to do with my original question about the standard, but if the jury got the photo array and the jury got an explanation of why they shouldn't believe the photo array from an expert, at what point or under what circumstances would the judge, instead of letting both those things in, let neither of them in? And that's what you're arguing, right, that it shouldn't have gone to the jury at all, as opposed to should have gone to the jury for whatever it was worth, what the expert's testimony explaining why they shouldn't believe it. History has taught us and shown us, and particularly with respect to some of the findings in the Innocence Project, that we have time and time and time again individuals that are convicted, where we have eyewitnesses who testify, that's the person, that's him or that's her, and it turns out they were in error. Eyewitness testimony in this culture is an icon. People, when they hear from the witness stand, that's him, are going to go with that witness the greater majority of the time, regardless of what else is presented, regardless of what other defense is there. It's one of those things that trips in the cultural fabric of this society a desire to want to believe and to credit that person. So can you articulate the standard that we're applying to decide, or which the court, district court was applying, to decide whether this whole thing should go forward or it should be truncated before it gets to the jury? It appears to me that the standard that Judge Brown utilized with respect to the determination as to whether or not the photo spread should be admitted is found in the trial record pages RT-208, where she said concerning the photo spread, quote, it's not perfect, unquote, nevertheless, it's not so suggestive as to point Mr. Beck necessarily into quotation. Now the problem with that determination was that, as I just pointed out, she was attempting herself without really considering Dr. Riesberg's testimony, and the theory underlying perception to find a justification for the photo spread. Dr. Riesberg, in his testimony, was unrebutted. This is not a case where you have two experts. Unrebutted testimony before the district court was that this photo spread presented, in the final analysis, one individual for selection. Suppose it was wrong and there were two. Would your argument still be the same? My argument would still be the same because the standard that's been set by those that know the government's own study in 1999 says to have a fair selection process, you have to have six. And those six photographs, one of which contains the suspect, have to, in fact, have some connection to the articulated description. And the reason why they made that determination as part of their manual was this very verbal memory aspect that I'm describing. Once an individual articulates a description, that's what they're going to fall back on. And what did Green and Zimmerman say to Agent Whipple when he asked them, why did you pick number five? Each of them, both of them said, long, black, wavy hair. He's the only one in the photo spread with long, black, wavy hair. An argument can be made concerning the individual number two. But Dr. Reesburg's testimony, unrebutted, was ultimately based on not only my examination as an experimental psychologist, but as well as a forensic study that I performed. My opinion is that there is only one individual that's going to be selected out, with individuals having the verbal memory formation that these individuals have. Now, in terms of standards, I suggest we can still use Mason v. Graithwaite. Mason v. Graithwaite basically said, look, it's a fairness issue, and we're looking for reliability. Juries should not receive unreliable evidence. The evidence that they should receive should be reliable evidence. That's why we have an evidence code, so the jury will ultimately have reliable evidence. The factors that were utilized in the Graithwaite case, drawn from Niels v. Biggar, those factors, to some extent, can still operate today. And I would argue to you that if you apply those factors to this case, that the identifications by Green and Zimmerman were not reliable using those factors. And what's your factor analysis? Go ahead. There's a whole level here at which evidence can be challenged, and the challenge goes to weight. And it's not something the jury gets to decide. It's not a constitutional impermissibility. But there's another level at which if it's unduly suggestive, maybe it can't be considered. So what's your argument based on the factors in the Supreme Court's case? Unduly suggestive in Graithwaite was a given. The petition in that case agreed that it was a given because there was only a single photograph. In Mr. Beck's situation, we have the same basic situation. There's only a single photograph. The booking photograph number five that meets the criteria for the establishment of a photo spread that's going to operate. So I would first of all say to you, Judge, that we meet the test from the standpoint of the first level. Was the photo spread impermissibly suggestive because it focused on a single individual? The answer to that is yes. I would add to that that the photo spread procedure was furthermore impermissibly suggestive because, as we know from Mr. Zimmerman, when he looked at the photo spread, he was holding the Banks surveillance photograph in one hand and the photo spread in the other, which is not. Why doesn't that make it better instead of worse? Makes it worse because the idea of a photo spread is to test independent memory, not to do. Why is it better if you test informed memory, memory that has a picture in front of it? Because then you're not testing memory. What you're testing is judgment. What you're testing is the individual's ability to perform a relative judgment. And the only problem with that, that would be great. That would be great if this photo spread had met the criteria. So that's not the issue with anything. I mean, you basically look at the photo spread, but the fact that they had this other photo, which could only help them be more accurate, can't possibly be a problem. That's not. Sometimes it's just not a problem under our cases anyway. That's not what memory, that's not what the individual's supposed to be doing when they recall from memory whether or not an individual's in a photo spread. That's a judgment function, not a memory function. And if we were going to grade witnesses on their judgment, then you've got to say, well, look, if we're going to do that, then at the very least this photo spread better be, meet the criteria of the description as initially given with respect to each of the choices. Now, let me see if I can clarify something. The standard, as it's been given to us in case law before, has focused on impermissibly suggestive, sort of without regard to verbal descriptions. That's really what you're arguing here. In other words, what the courts are intending to do is look at the photo array on its face and say, could somebody who didn't know anything figure out who was being pointed to here? Isn't that what the earlier cases have done? I would say yes. That's basically what they did, and that's kind of what Judge Brown did in this case, and that ignores a decade or more of scientific analysis, study, research, and confirmed results. That basically is utilizing the epistemology of the old tabula rasa variety that says, sensation is just an imprint on the mind, and when you look at something, you pull the imprint back up. That is no longer accepted from the standpoint of what we know about human cognition. And let me just, Judge Gold, I know that my time is running over, but I'd like to respond to your question. I was just going to point out that you wanted to keep some rebuttal time, but you only had a minute and a half. Well, let me respond to my rebuttal time. Thank you. Please record, counsel, Franklin and for the government. I may not take my full 20 minutes, but certainly I'll take as much time as necessary to answer questions. First of all, Your Honors, on the question of the photo spread itself, if I can take that. I think Carvajal and the other cases hold that the test is whether there is a substantial likelihood of misidentification based upon a photo spread. And I think that this Court's review of that issue is de novo. The Court has, courtesy of Mr. Schatz, the photo spread which was used by the FBI to identify the defendant, Mr. Beck. And I would suggest that looking at the photo spread, I would suggest, I guess I would hope that this Court would reach the same conclusion that Judge Brown did, which is that there is no constitutional infirmity in that photo spread. And in that regard, Your Honors, I would point to the fact that this, with some acceptance, and I think that relates to the showing of the surveillance photograph, I don't think there is evidence in this case that the agents did something, as sometimes happens by looking over a shoulder or nodding or winking or something, to suggest to any of the witnesses who they should identify or, in fact, that they had made a proper identification. So that's Carvajal, Simmons, Stubblefield, and the other cases of this circuit, holding that the real test is substantial likelihood of misidentification. And I would suggest to the Court, based upon the photo spread that Your Honors will, I'm sure you've already looked at it, and I'm sure that if you look at it again, you'll find that that did not occur. And then in response to a question from Judge Berzon, I think that Monk's, the Monk's case cited in the government's brief, also clearly indicates that use of a surveillance photograph in conjunction with a photo spread does not inject error, if, in fact, the photo spread is not unduly suggested. So there is a two-pronged – this is what I thought, although it's not clear. There is a two-pronged standard which differs depending on whether you're looking at the photo spread itself or an I.D. based on the photo spread. I think you just articulated a difference, Judge. Yes, and I think that the I.D. based upon the photo spread I intended to address, Your Honor, and I'll skip to that with one quick case note. Stubblefield, which is cited by the defendant, I think is even stronger on the issue of use of a surveillance photograph because my reading of Stubblefield is that in the Stubblefield case, the witness, the bank teller, the victim teller, if you will, actually – it's not clear from the Stubblefield record how she did this, but saw the defendant in court on an occasion prior to making the in-court identification. And that's at least as strong or maybe stronger, I think, than actually the surveillance photograph itself. Now – So in making the first decision, when there's a substantial likelihood of misidentification based on the photo spread, I gather that you agree that the photo spread evidence was independently introduced here. I'm sorry, Your Honor. But the photo spread evidence was independently introduced, right? Yes, yes. Both the – Mr. Schatz is correct. Both the witness, Green, and Zimmerman testified regarding the prior identification they made from the photo. Okay. Now, so is Mr. – is Dr. Reisberg's evidence relevant to the substantial likelihood of misidentification question or not sufficient in itself? Are we supposed to look at this without any expert evidence, or if we have expert evidence that is useful and it tells us that you can't just look at whether one of them is purple and one of them is green, but that you have to take into account this verbal articulation, which I must say, you know, sort of on a commonsensy basis makes sense to me. Do we just ignore that, or what do we do? Well, I don't think I can make the argument that either you or the trial court should ignore it. No, I didn't try to make that argument. Is evidence – So at some level, an expert like that might be sufficient to demonstrate that there is a substantial likelihood of misidentification even absent people pointing at things or purple versus blue photos or something like that. I guess my response, Your Honor, would be I don't think this is the case, but could it happen? I suppose so. So why isn't this the case? And I should correct myself. I did argue in the pretrial motions that the court shouldn't consider it. I mean, I did object to the evidence, but I lost. So why isn't this the case in which Dr. Reesburg's evidence has little charts? He showed this to a bunch of people. They all picked number five based on their verbal descriptions. Well, I think Dr. Reesburg's employing a different standard. Dr. Reesburg, you will recall, at one point said there is a likelihood of misidentification, and I may be oversimplifying or misstating his argument. If I am, someone will correct me. But I think part of what he's saying is because the depiction in number five is consistent with the descriptions that the witnesses gave, therefore, there is a likelihood that the witness will identify number five, and I think probably that's correct, but my response to that, Judge Burson, would be the same response that you made with respect to the surveillance photograph. If that's a defect in the photo spread, then what comes off of it? Presumably, the witness, and I may be missing something in Dr. Reesburg. He's a professor at Reed, smarter than I am, but presumably a witness who sees somebody and recalls and gives a description is going to be more likely to pick a person matching that description out of a photo spread. Sure, but you could put six people to match the description. Then you'd really know whether they were picking the right person. If you could find six people that looked exactly alike. No, they don't have to look exactly alike. But I would suggest, especially cap two, three, and five are very similar, and I think that the observation of Judge Brown regarding the picture of number three is correct. You can see that he does appear to me, I can't tell whether he says what or not, but it appears to me that his hair is long. It appears to me his hair is down on the collar, and it may be down on the collar even a little bit more than number five. But I will leave that, obviously, to the court. Now, if I may, now let's assume for the moment that your honors would disagree with me, and that happens from time to time, and find that there's something suggestive about the photo spread. Then I think we'd pass to the second question, and that is even if there's a defect in that photo spread, is the eyewitness testimony then of Shantina Green permissible? And passing to what? She identified the defendant. She had an opportunity. She was two to three feet away from the defendant. That's in the transcript. She was paying attention to the defendant, and with the exception of the question of whether they were prescription glasses or dark glasses, her description of the defendant was consistent with that of the defendant, and she was certain. And if I may, your honors, just briefly, the court in the Carbajal case, if I'm pronouncing that correctly, on the facts slightly weaker, approved of the use of in-court identification holding as follows. Pope, who was the victim teller in that case, testified she'd had a good look at the robber for approximately 30 seconds. Here, best-case scenario for defendant, Ms. Green had an opportunity to look at the defendant for over a minute. He stood a couple of feet away, and I'm not remembering precisely what Ms. Green said regarding the distance, but it's something very close to that, I believe. And she was certain that he was the robber. All of those facts consistent with the testimony of the witness, Shantina Green, in this case, and my position on that, consistent with this court's holding in the Kessler case and in the Manson briefly case, that presented a jury question. The admissibility of the evidence was a matter for the prior fact for the judge, and the weight of that, I believe, was for the jury. But if we agreed with that, we still have these other two. We still have the evidence about the photo array ID itself, right? Yes, your honor. My analysis is if your honors conclude that the photo spread was defective. And those factors, O'Neill v. Biggest Factors, go to the second question, not really to the first one. Oh, yes. Right? If you don't find it defective, which I argued, then the inquiry is over. If it's defective, then you pass to the faculty. Do you have any cases, most of the inquiry it seems to me has been in the second question, but what cases would you point us to on the question of what's an impermissibly suggested array in the first place? I don't think I cited cases for one to the court holding that it was impermissibly suggested. I think Mr. Schatz has done that. I would rely on the case. I would rely on the case. No, no. I'm just part of the standard. What standard are we applying to that question as opposed to the second in-court ID question? The standard applicable, your honor, to the first question I think is that stated in Carvajal, and I would rely on that. I don't think there is a factors analysis, at least in the cases that I saw. I did not see a factors analysis, and I don't mean to be flippant or light-hearted. I think it is a little bit of a common sense kind of determination, and I think it's a matter for a trial court, for a district court judge and a jury, to look at exhibits such as the exhibit which the court had before it,   and then determine whether looking at those photos, there's something about the spread itself that is so suggestive, it's constitutionally infirm. And here, your honor, I'm suggesting that it was not. I hope I've answered your question. They even say in Carvajal that literally at least the standard is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable. Yes, your honor. So they used the intensifier of Barry. I think it's a pretty rigorous. It's a very strict standard, I think, on its face as to constitutionality. I think, your honor, that's correct. And I think then the question is for the jury. And this jury certainly, and I think it's worth noting, Mr. Schatz did an outstanding job of presenting lots and lots of evidence to this jury that went to the single question of identification. So they had an abundance of evidence on that issue. If I could briefly pass, your honor, to the testimony of Edward Glover, who was the probation officer. Yeah, I would appreciate if you'd touch on that, because at least I didn't see any Ninth Circuit precedent that clearly would indicate that someone like a probation officer who had met the person for the length of time involved here could give a lay opinion testimony. I think the Henderson case is one, your honor. And the testimony of Edward Glover, and if I could, I would like the court to recall that Judge Brown did not allow the jury to hear that he was a probation officer. Now, I understand Mr. Schatz' arguments in that regard about inferences that might have been drawn in his testimony, but they didn't hear that. And given the five contacts that probation officer Glover had, best case scenario for the defendant, he met on four or five occasions for a total of 60 minutes. Okay, but see, I thought in Henderson that the witness had met with the person he's identifying more than 100 times. It's unclear what those contacts were from Henderson, your honor. But I would simply submit that I'm not. But isn't that number correct? I think it is. From that case. So this case involves less contact, less frequent contact. Why is what's involved here enough? Because, your honor, from the testimony, the court is aware these were face-to-face meetings by a probation officer. There was no indication of any difficulty they would have had. They were all, I think, several times Officer Glover testified they were separated by a table or seated in chairs. Very close face-to-face confrontations. They were not stressful confrontations as might be with a victim in a bank. And I would simply submit that 60 minutes to an hour and a half over a period of two months of face-to-face meetings with the defendant was sufficient for admissibility. And I guess I would also stress, your honor, that What is this theory underlying this kind of evidence? It's that it's essentially that the better you know somebody, the more likely you are to be able to tell from a photograph who they are. I mean, think that, you know, if you're dealing with a photograph and a person is sitting in front of you, that the jury ought to be able to tell just as well as anybody else whether that photograph is of the person sitting in front of them. Well, your honor, the photograph, the surveillance photograph is also an evidence, and Mr. Schatz has included that. Right. And I suppose And that's what he was testifying to. He wasn't testifying that that guy is so-and-so. He was testifying that that guy is the guy in the surveillance photo, right? No, no. He testified that the guy in the surveillance photograph was Mr. Beck. Right. And my position on that is that, yeah, I mean, it does depend how well you know. I mean, Judge Gould's question is, you know, how, I guess, how much time, how long, how many times do you have to see somebody before you can do it? And here, four or five times over, I believe, a period of two months, or a total period of an hour and a half, gave Mr. Glover certainly the opportunity to see the defendant well enough to identify the surveillance photograph. And I think this Court's test in that regard is whether or not the witness, getting to summing up here, whether or not the witness has had sufficient contact. And I suggest that is. And also, with respect to this issue, the standard of review for this Court, I believe, is abuse of discretion. The problem I'm having is that I don't know how to review something unless I know what it is that I'm looking for. And somehow we're looking here for a degree of familiarity with someone that makes the person with that familiarity enough of a better judgment about whether a photograph is the person than the jury who has the photograph of the person sitting in front of them. So you need some theory of cognition underlying that. I guess my response to that, Your Honor, is I don't know that the government, or I guess any party, should be limited in that regard. I mean, we can ask the jury to look at it and make a determination. And, you know, this was a tough case. You know the jury deadlocked the first time around. And it was a case that should have gone to trial. This is a case that should have been resolved by a jury. And Mr. Schatz appropriately put it to a jury. So it was that kind of a case. And, frankly, I wasn't going to limit myself to just letting the jury look at the surveillance photograph. I believe it was admissible under this Court's holdings. I don't believe it was an abuse of discretion by the judge. And I know I'm getting perilously close to being out of time. The judge did instruct the government not to introduce evidence that Mr. Glover was a probation officer. And that wasn't done. And it seems to me that Mr. Schatz did have the real opportunity to cross-examine Mr. Glover because he did have the opportunity to say your testimony was different on a prior occasion. And the Court recalled the difficulty here was on an early occasion he said, I knew it was Mr. Beck before I saw the photograph. But he said on that occasion, you know, it's in my notes and I don't have my notes here. He looked at his notes and then during trial he testified, well, I looked at my notes. I didn't know it was Mr. Beck until after I saw it. But the opportunity to cross-examine him certainly was there. And I don't think the cross-examination in any way would have to disclose his status as a probation officer. And I just agree. I would think that would be discretionary. It could be said it's unduly prejudicial if that had been disclosed. I mean, I guess there's an argument either way. Well, Your Honor, yes. You've got cases, whatever the theory is of these Rule 701 identifications, it seems like we have cases in the Ninth Circuit permitting lay opinion on that. I think we do, Your Honor. And I think that in the Butcher case, side of Mr. Schatz, the lay identification that was made was similar to what occurred here. But there the jury knew that the identification was being made by a police officer. So I think there's also a parole officer in Butcher. Then that may be in your eyes. You're following the case this morning better than I am. I was on the panel. That's why I remember. I know that one was a police officer. It seems like the standard for the court under our Henderson decision is whether permitting that lay opinion testimony is going to be helpful. Yes. It would be helpful to the jury. Yes. And we review that for abuse of discretion. Yes, Your Honor. That's correct. And then just very, very quickly, finally, I think that the rebuttal from Special Agent Whipple, which was not extensive, was appropriate in response to what I think we all considered was a very admirable job by Mr. Schatz in challenging the identification testimony. What did Whipple say about what factors he fed into the computer that generated this list?  Well, Your Honor, the one factor I remember very well was that he said that it was limited by my glasses. And he fed a number of things into the glasses, excuse me, into the computer. And I think dark hair and the thing that stands out in my mind right now is that he had to feed into the software, whatever he had that produced this, the concept of glasses. And that somewhat limited the number of booking photographs, if you will, that came up. Okay. Thank you very much, Your Honor. Thank you. Your time was used up, but I'll be lax and let you have a minute. A minute. I'll make good use of it. Don't overdo it. I won't overdo it. One minute, I can see fine. With respect to Henderson and the admission of the testimony of Mr. Glover, Butcher and Henderson basically both established that the court is supposed to do, perform an analysis concerning the need for testimony by a law enforcement officer. That analysis did not take place. In Henderson, the only individual who could testify was the police officer. That's why that individual's testimony was admitted. That was clear from the opinion. Here, the government's contention is that we have other eyewitnesses. Judge Brown never did perform an analysis concerning whether or not there was a need for probation officer Glover to testify. The end result of Glover's testimony was he violated the Sixth Amendment rights of Mr. Beck in terms of our opportunity to confront. I guess I've got to give you a little more than a minute then to answer my question. Okay. It seems that what you're arguing is instead of the test of permitting the expert opinion, the lay opinion testimony being helpful is that your argument has to be necessary. And I thought Henderson said helpful was the standard, not necessary. In terms of the standard for the admissibility of Rule 701, lay opinion identification testimony, Your Honor is absolutely correct. But there's a different, there's an added factor when you're dealing with a police officer, probation officer. It says that the judge didn't identify him as a probation officer. That's not correct. That's true, that he was supposedly limited in terms of how he was to present himself, and that limitation was in fact enforced. It fell apart when he changed his testimony from what he had previously told not just me, but Judge Brown in response to Judge Brown's questions concerning what was in his notes in terms of the order in which he had seen the photographers vis-a-vis hearing about some law enforcement officers identifying Mr. Beck. When he changed his testimony in front of the jury, in court, and remember there was a motion hearing April 4, there was a trial, first trial, no mention of this in the first trial. It's only in the second trial in July. So from May to July until he takes the witness stand, this officer of the court had information concerning his testimony that he intended to change, never advised anybody as to the fact that he was going to change his testimony. And there was no way I could cross-examine this individual once he had stated on the witness stand it was my notes. This court itself has instructed defense lawyers to- You impeached him with his prior testimony, and he's got an explanation. I didn't look at my notes. I mean, that comes up in depositions. I'll bet every day in Portland that probably happens. Well, I don't know about every day, Your Honor, but clearly when you have an individual who takes the witness stand, and his response is, gosh, I looked at my notes, and now my testimony is different from my previously sworn testimony, he's on the verge of basically telling that jury, guess what, I'm a law enforcement officer. Did he say I looked at my notes as a probation officer? No, he did not. He said I looked at notes. That's right, and that's why, and because I could not ask those second questions, such as, and how was it that you came to be taking notes, and where are your notes, by the way, I was therefore excluded from effective cross-examination of this witness. Now, remember, and one thing- Because only police officers take notes? How many police officers- Because only police officers take notes? I'm having a hard time understanding- In most instances, in terms of professional witnesses who take the witness stand, concerning their interaction with an individual, just out in the general society, people are not taking notes. They're talking about somebody that they knew. That was the guise in which the court had constrained the presentation of Mr. Glover. He was not there as a note-taker. Juries are not uneducated. They know who the note-takers are. The note-takers are people that are officials. We've gone way over your time, but go ahead. You're going to give me one last thing. I think it's important to recognize that there was a mistrial in this case, and additional things happened in the second trial. So remember that in the first trial, where Dr. Riesberg had the opportunity to testify without being rebutted by Agent Whipple, that jury hung. And that first trial, when Mr. Glover did not change his testimony, that jury hung. I think that's an important fact, and I hope you appreciate it. Thank you. It's very well argued. We appreciate it. The next case is U.S. v. Ayala v. Mercado v. Carlos Torres Espinosa. We have appellant's counsel for two different defendants.
judges: Wallace, Gould, Berzon